955 A.2d 834

**SHANGRI–LA LIMITED PARTNERSHIP, et al.**

v.

**Lisa MEADE.**

**No. 1528, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Sept. 3, 2008.

128

Pamela Dement–Carpenter (Semmes, Bowen, Semmes, on the brief), Baltimore, for appellant.

Michael J. Silverman, Columbia, for appellee.

Panel: MEREDITH, WOODWARD and JOSEPH F. MURPHY, JR.,* JJ.

MEREDITH, J.

After a nursery school in Howard County denied a parent's request that it abandon use of latex gloves to accommodate her allergy to latex, the parent filed suit in the Circuit Court for Howard County alleging that she had been discriminated against on account of her handicap. A jury found in her favor on the discrimination claim she asserted pursuant to the Howard County Human Rights Code ("HCHR Code"). The school argues that its motion for judgment, as well as its

---

*Joseph F. Murphy, Jr., now serving on the Court of Appeals, participated in the hearing and conference of this case while an active member of this Court; he participated in the adoption of this opinion as a specially assigned member of this Court.

motion for judgment notwithstanding the verdict, should have been granted because the evidence was insufficient to enable a reasonable jury to find that the parent's latex allergy imposed a substantial restriction upon a major life activity. We agree with the appellants that their motion for judgment notwithstanding the verdict should have been granted. Accordingly, we shall reverse the judgment of the circuit court.

### Factual Background and Procedural History

In 1997, Lisa Meade, the appellee, was diagnosed with a latex allergy. Health care workers often develop these allergies due to their frequent exposure to latex. The recommended treatment for a latex allergy is to avoid exposure to latex. Exposure triggers an allergic reaction such as itchy skin, asthma symptoms, and, in extreme cases, respiratory arrest. There is also a cumulative effect caused by repeated exposures, such that each additional exposure can increase the patient's sensitivity to latex.

Latex is found in household products such as balloons and gloves. Powdered latex gloves are more dangerous for people allergic to latex than non-powdered gloves, because the powder picks up latex particles from the gloves and then travels through the air, where it can be breathed into the lungs. In addition to direct exposure from touching latex products or breathing the powder from latex gloves, patients can experience secondary exposure from food or clothing that has come into contact with latex.

Meade enrolled her older son, James, at the Children's Manor Montessori School from 1994 to 1997. The school is owned by the appellants. Dr. Pradip K. Ghosh is the head administrator at the school. While James attended Children's Manor, Meade participated in activities at the school and talked to James's teachers in his classroom. She did not have any allergic reactions as a result of latex exposure at the school during that time period.

In 1999, however, when Meade enrolled her two-year-old son, Andrew, at Children's Manor, she noticed that some of

the teachers were using powdered latex gloves when they changed the children's diapers. Concerned about her possible exposure to latex, Meade asked the teachers to use the less dangerous non-powdered latex gloves, and asked her son's teacher to use non-latex gloves, which Meade offered to provide. Meade also spoke with Ghosh about her allergy in September of 1999, and asked him to switch to using non-powdered gloves throughout the school. Ghosh told her he would look into it. Meade followed up by asking her physician, Dr. Golden, to send Ghosh a letter explaining her allergy. Dr. Golden did so on September 3, 1999, and Ghosh admitted at trial that he had read the letter. Meade also asked Dr. Voight, an occupational physician who worked for her employer, to call Ghosh.

Meade testified that, while she was waiting for a response from Ghosh, she spent as little time as possible in the school. Meade said she "would have liked to have been more a part of ... my son's pre-school experience ... [by] participat[ing] in the activities .... and [meeting] with his teachers to learn about his progress." But, because she did not want to expose herself to latex, she felt that she could not participate in Andrew's school experience. Meade admitted, however, that she had never had an allergic reaction while at the school.

When Meade spoke to Ghosh about the issue again, he told her he would not switch to a different type of gloves. According to Meade, Ghosh did not want to be bothered with the issue. Ghosh claimed that he never explicitly refused to make the switch, although he admitted that he was reluctant to change suppliers. Ghosh did, however, tell his staff to stop using latex gloves when changing Andrew. Ghosh also allowed Meade to pick Andrew up at the front desk rather than coming into the classroom, as the other parents were required to do.

Not satisfied with these accommodations, Meade provided Ghosh with more information about her allergy in October 1999. She also met with him in November to discuss the issue. According to Ghosh, Meade was very angry and threat-

ened to sue him when he told her that he did not consider her allergy a handicap. Meade wrote Ghosh a letter on November 29, 1999, in a final attempt to persuade him to switch to non-latex gloves. In this last letter, she provided "information regarding [her] latex allergy and [her] rights under the law," including information about the Americans with Disabilities Act. Due to the perceived threat of litigation and Meade's health concerns, Ghosh invoked a provision in their contract that allowed him to "ask any pupil to withdraw, at any time, for any reason the administration feels provocation is sufficient." By letter dated December 2, 1999, Ghosh asked her to withdraw Andrew from the school, and gave Meade one month to find alternative care for Andrew. Meade chose to remove Andrew from the school immediately, and eventually enrolled him at Kindercare at a higher cost. The Kindercare facility had already discontinued use of powdered latex gloves to accommodate another child attending that school. After Andrew attended Kindercare for seven months, Meade withdrew him from that school and enrolled him at another facility.

As a result of these events, Meade filed a complaint with the Howard County Office of Human Rights, alleging that she had been discriminated against in the provision of public accommodations on account of her handicap, namely, her latex allergy. The HCHR Code provides in Subtitle 2, Sec. 12.210 II: "It shall be unlawful if, because of discrimination [on account of handicap], an owner or operator (or his/her agent) of public accommodations denies any person any of the accommodations, advantages, facilities or privileges of such public accommodations." The term "handicap" is defined in Sec. 12.201 IX to mean:

With respect to an individual:

(a) A physical or mental impairment which substantially limits one or more of the individual's major life activities; or

(b) A record of having such an impairment; or

(c) Being regarded as having such an impairment.

The Howard County Office of Human Rights concluded that Meade had "established a prima facie case of disability accom-

modation[s] discrimination when she alleged that she has a disability which affects the major life activity of breathing." The Office of Human Rights concluded that there was reasonable cause to believe that the school had failed to accommodate Meade's disability.

After the Office of Human Rights issued its finding of reasonable cause, Meade filed suit against Children's Manor Montessori School in the Circuit Court for Howard County on April 26, 2001, contending that Ghosh had discriminated against her based on her latex allergy in violation of § 12.210 of the Howard County Human Rights Code. Meade also alleged that when Ghosh asked Andrew to withdraw from Children's Manor he was retaliating against her for requesting an accommodation, in violation of § 12.213. The only defendant named in Meade's original complaint was Children's Manor Montessori School, but Meade later amended her complaint to add as defendants Shangrila Limited Partnership, which owns the school, and Shangrila Enterprises, Inc., which is Shangrila Limited Partnership's general partner. Ghosh is the administrative head of Children's Manor, a limited partner in Shangrila Limited Partnership, and a shareholder in Shangrila Enterprises. It was not disputed that the defendants would be liable to Meade if Ghosh violated the HCHR Code provisions prohibiting discrimination on account of handicap.

One of the contested issues at trial was whether Meade's latex allergy constituted a handicap under the law. Throughout the jury trial, Meade's counsel argued that her allergy was a handicap because the allergy substantially limited one of her major life activities, specifically, breathing.

At the close of all the evidence, the defendants moved for judgment, but the trial court deferred ruling on the motion until after the jury returned a verdict. The jury found in favor of Meade and awarded her $1,683 in economic damages, $5,000 in non-economic damages, and $22,800 in attorney's fees. On February 23, 2006, the court delivered an oral opinion denying the defendants' motion for judgment and their

oral motion for judgment notwithstanding verdict (JNOV). Judgment was entered against each of the defendants in accordance with the jury's verdict. Defendants then filed a motion for a new trial, which was denied on August 15, 2006. The three defendants timely noted this appeal on September 14, 2006.

## Analysis

Although appellants raised two questions in their brief, the first question is dispositive. Appellants' question is whether the circuit court erred in denying the defendants' motions for judgment and for JNOV. Although the defendants originally made a motion for judgment at the close of all evidence, the trial court reserved ruling on that motion until after the jury had rendered its verdict. Maryland Rule 2–532(b) provides: "If the court reserves ruling on a motion for judgment made at the close of all the evidence, that motion becomes a motion for judgment notwithstanding the verdict if the verdict is against the moving party." The standard of review for a ruling on a motion for JNOV is whether the trial court was legally correct. *See, e.g., Shabazz v. Bob Evans Farms, Inc.,* 163 Md.App. 602, 643, 881 A.2d 1212 (2005). The motion tests the sufficiency of the evidence, which we must view, along with "the reasonable inferences to be drawn from it[,] . . . in the light most favorable to the party opposing the motion." *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 327, 389 A.2d 887 (1978).

Section 12.210 of the HCHR Code makes it unlawful for any public accommodation to deny "any person any of the accommodations, advantages, facilities or privileges of such public accommodations" "because of discrimination." Section 12.213 provides that "[i]t shall be unlawful for any person to: (a) Retaliate against another person . . . because the person has (1) Lawfully opposed any act or failure to act that is in violation of this subtitle; or (2) In good faith, filed a complaint, testified, participated or assisted in any way in a proceeding pursuant to this subtitle." The HCHR Code provides that the "[w]ords and phrases used in this subtitle shall have their

usual meaning, except as defined below: ...." The terms "discrimination," "public accommodation," and "handicap" are all defined in the HCHR Code § 12.201.

■ Most pertinent to the issue on appeal is the definition of "handicap" in Section 12.201, quoted above, which defines the term using language virtually identical to the definition of "disability" in the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. The ADA defines "disability" as follows in 42 U.S.C. § 12102: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; [or] (B) a record of such an impairment; or (C) being regarded as having such an impairment." Because there is no significant difference between the definition of "handicap" under the HCHR Code and "disability" under the ADA, and because there is no case law interpreting the HCHR Code, both parties agreed that we should look to federal law interpreting the ADA for guidance. *Cf. Ridgely v. Montgomery County,* 164 Md.App. 214, 232, 883 A.2d 182 (looking to federal decisions interpreting the ADA for guidance in interpreting similar provisions in the Montgomery County Code), *cert. denied,* 390 Md. 286, 888 A.2d 342 (2005). We agree that, because of the virtually identical language in the two definitions, the two statutes should be construed in the same manner.

■ The Supreme Court has held that the determination of whether someone is "disabled," as that term is used in the ADA, is a three part analysis:

First, we consider whether [the condition] was a physical impairment. Second, we identify the life activity upon which respondent relies ... and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

*Bragdon v. Abbott,* 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). As the Supreme Court stated in *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 195, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002): "Merely having an impairment

does not make one disabled for purposes of the ADA. Claimants also need to demonstrate that the impairment limits a major life activity." (Citation omitted). And, "[t]o qualify as disabled, a claimant must further show that the limitation on the major life activity is 'substantia[l].' 42 U.S.C. § 12102(2)(A)." *Id.*

Applying this three-step analysis to Meade's case, the first question is whether her latex allergy constitutes an impairment, which the Equal Employment Opportunity Commission defines as a "physiological disorder, or condition ... affecting one or more of the following body systems: ... respiratory...." 29 C.F.R. § 1630.2(h). There is little dispute that Meade's allergy is a physical impairment.

■ The more difficult questions are whether the impairment impinges upon activities that the law recognizes as major life activities, and whether any such impingement is great enough to be considered a "substantial limitation" upon those activities. Throughout the trial and closing arguments of this case, Meade specifically claimed that breathing is the major life activity that is significantly impaired by her latex allergy, and that the restriction of her breathing is the reason she is protected as a person suffering from a handicap. It is clear that breathing qualifies as a major life activity. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 480, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (" '[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' ") (quoting 29 C.F.R. § 1630.2(i)). *Accord Watson v. Hughston Sports Med. Hosp.*, 231 F.Supp.2d 1344, 1349 (M.D.Ga.2002) ("Breathing is obviously a 'major life activity' under anyone's definition.").

But cases interpreting the definition of a disability under the ADA have excluded numerous claims based on the third step in the analysis, concluding that although an impairment affects a major life activity, the impairment does not constitute a substantial limitation on the major life activity. In the *Toyota Motor* case, the Supreme Court elaborated on the

meaning of the phrase "substantially limits" in the ADA, and stated, 534 U.S. at 196–97, 122 S.Ct. 681:

> "[S]ubstantially" in the phrase "substantially limits" suggests "considerable" or "to a large degree." ... The word "substantial" thus clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities.

(Internal citations omitted.) The Court further observed in *Toyota Motor* that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* at 197, 122 S.Ct. 681. Accordingly, the Court stated, *id.* at 198, 122 S.Ct. 681:

> We therefore hold that to be substantially limited in performing [the pertinent major life activity], an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long term.

(Citation omitted.)

In *Watson, supra,* 231 F.Supp.2d at 1350, the court focused upon the issue of substantial limitation when it considered whether an allergy satisfies the definition of a disability if the symptoms can be managed by changes in the individual's lifestyle. In that case, a hospital refused to hire a nurse because the nurse was allergic to latex. Although the nurse claimed that the hospital had discriminated against her because of her disability—*i.e.,* her latex allergy—the court concluded that her allergy did not substantially limit her in such major life activities as breathing and working. The court granted summary judgment for the hospital. With respect to the nurse's claim that her allergy substantially limited her breathing, the court stated, *id.* at 1349–50:

> Breathing is obviously a "major life activity" under anyone's definition. However, applying the above factors to determine whether Plaintiff's breathing has been "substantially limited" by her allergy, the Court must conclude that Watson has no such substantial limitations and is therefore

not disabled for ADA purposes. First, the evidence reveals that, while the RAST blood test shows that Watson has a latex sensitivity of four on a scale of five, her reactions thus far have not been severe. Furthermore, the only restriction placed upon her as a result of the allergy is to avoid contact with latex at work and at home. Moreover, Plaintiff's allergy, while permanent, is dormant unless activated by exposure to latex. In other words, her "impairment" does not restrict her from engaging in the major life activity of breathing. It simply has the possibility of doing so if she exposes herself to latex. Just as people who are allergic to bees are not in danger of a reaction until they are stung, Watson does not suffer any adverse effects because of her allergy to latex unless and until she comes in contact with it. Similarly, the permanent or long term impact of Watson's allergy to latex appears minimal, as long as she avoids contact with the substance.

Perhaps the most persuasive evidence that Watson is not substantially limited in the life activity of breathing is the undisputed evidence that she currently works both full-time and part-time as a registered nurse, a job which not only requires "breathing" but requires one to engage in strenuous "major life activities." Watson described only a few occurrences where she has had trouble breathing because of her latex allergy as opposed to her pre-existing asthma. Based on the foregoing, the Court finds as a matter of law that Watson's latex allergy does not substantially limit her ability to breathe.

Similarly, in *McLorn v. Comty. Health Servs.*, 456 F.Supp.2d 991 (S.D.Ill.2006), the court rejected the ADA claim of a person who alleged he had been terminated because of the fact that his latex allergy affected his work. The employee's job as a hospital janitor required him to wear a protective suit and gloves made of synthetic latex whenever he was handling biohazardous materials. The employee had not realized he had the allergy when he was hired, but experienced an oozing rash and sores after he wore the latex garments at work. After the employer terminated the employee for reasons the

employer alleged were unrelated to the latex allergy, the employee filed suit under the ADA, claiming that he was disabled because the allergy limited "his ability to perform manual tasks, sleep, breathe and work." *Id.* at 996. The employer moved for summary judgment, arguing that the employee could not show that his latex allergy imposed a substantial limitation on a major life activity. The employer argued "that even a severe and permanent allergy does not substantially limit a major life activity where an allergic reaction is dormant and is only triggered by exposure to a specific allergen." *Id.* The court agreed that the employee's latex allergy was not an impairment that rendered him "disabled," and entered summary judgment for the hospital, explaining, *id.* at 996–97:

> There is no evidence from which a reasonable jury could conclude that McLorn's allergy to synthetic latex substantially impairs any of his major life activities. The evidence shows that McLorn's allergic reaction is somewhat severe, but not life-threatening. However, he experiences this reaction only when he comes into contact with synthetic latex, which he has apparently only done while working at [the hospital]. Although it took some time after leaving [the hospital] for his allergy symptoms to go away—maybe as much as several months—they did go away, and they did not reappear. In fact, McLorn testified at his deposition that he was fine once the symptoms went away, and the record shows that he was able to obtain later employment in the cleaning/janitorial, painting and auto repair fields. Rather than demonstrating a substantial impairment of a major life activity, the evidence demonstrates mere periodic episodes of allergic reactions that occurred only when McLorn was in direct contact with latex. *See, e.g., Moore v. J.B. Hunt Transp., Inc.,* 221 F.3d 944, 952 (7th Cir.2000) (intermittent flare-ups may not render a condition a "disability" under the ADA); *Land v. Baptist Med. Ctr.,* 164 F.3d 423, 424–25 (8th Cir.1999) (peanut allergy did not substantially impair major life activity because breathing was only restricted during allergic reactions).

Similarly, in *Land v. Baptist Med. Ctr.*, 164 F.3d 423, 424 (8th Cir.1999), summary judgment was granted in favor of a day care center that had excluded a child after the child suffered two allergic reactions to peanuts. The United States Court of Appeals for the Eighth Circuit held that the child's ability to breathe was not substantially limited, because her "ability to breathe is generally unrestricted, except for the limitations she experienced during her two allergic reactions." *Id.* at 425. The court concluded: "[A]lthough [the child's] allergic reaction to peanut-laden foods affects her eating and breathing, her allergy does not substantially or materially limit these major life activities within the definition of disability under the ADA." *Id.*

In the instant case, Meade testified that she can control her latex allergy by avoiding certain products. For example, she testified that she stopped using latex gloves at work, and her employer stopped using powdered latex gloves. When asked if she "changed any other aspects of [her] life as a result of the diagnosis," Ms. Meade said:

> Yes; ... latex is in many areas of our environment. Balloons are latex; I cannot touch or have balloons in my home. Erasers on pencils are latex; I have to use special—or, my children have to use special erasers for their schoolwork. Rubber bands are latex; I can't have rubber bands or touch a rubber band. I use another kind of product called a plastic band as a substitute. Cleaning gloves for doing routine housework cannot be—the typical yellow latex gloves, because those are latex. Those are a few examples.

Ms. Meade also described the few times she had accidentally been exposed to latex after she learned of her allergy. These incidents occurred as a result of: eating at a restaurant in which the employees use latex gloves to handle the food, visiting her mother at a hospital, taking her son to the dentist, hugging her husband after he came home from the dentist, and having her blood drawn. But these instances of accidental exposure were relatively infrequent, and on none of those occasions was her reaction serious enough that she had to go

to the hospital. Instead, she simply treated the allergic reaction with an inhaler. There was no evidence that Meade's breathing was at all limited when she was not exposed to latex. Meade admitted that she never experienced any allergic reactions to latex while actually at the Children's Manor school. Viewing all of this evidence in a light most favorable to Meade, she did not prove that her allergy imposed a substantial limitation upon her breathing that rendered her disabled or handicapped.

As the Supreme Court explained in *Sutton, supra,* 527 U.S. at 482–83, 119 S.Ct. 2139:

A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

Indeed, when the trial court announced its ruling on the defendants' motion for judgment and motion for JNOV, the court concluded: "[I]f the question of whether the plaintiff was handicapped[ ] required the jury to consider only the major life activity of breathing, then the defendant would be entitled to a judgment." We agree.

■ But the trial court denied the defendants' motions because the court concluded that the evidence was sufficient for the jury to find a substantial limitation on the major life activities of socialization and parenting. In reaching this conclusion, the court erred for two reasons. First, the case had not presented that alternative theory of liability to the jury. Second, even if we were to assume, *arguendo,* that socialization and parenting are major life activities, the evidence failed to show that Meade's latex allergy had caused a

substantial limitation in her ability to engage in either socialization or parenting.

Meade's amended complaint, upon which the case was tried, alleged: "Plaintiff has an allergy to latex that affects major life activities including breathing." The complaint did not allege that the allergy also impaired the major life activities of parenting and socialization. During opening statements, Meade's counsel argued that Meade's "latex allergy affects, among other things, her breathing." Not only did Meade fail to produce sufficient evidence to show that her ability to socialize and parent were substantially limited, these major life activities were never mentioned to the jury by Meade's counsel during closing arguments. In his closing argument, Meade's counsel asserted:

> You're going to be called upon to apply the law to the facts. You've heard me summarize the facts. Let's talk about how it applies to the law. She has [a] handicap—is [sic] her latex allergy. It affects a major life function. Her breathing. There are many major life functions. Walking. Talking. Being able to move about uninhibited. Being able to hear, being able to see. And being able to breathe. I don't know if I could characterize one as more important than the other, but I would certainly characteriz[e] breathing as a major life function.

Counsel went on to discuss the fact that Meade was unable to participate in activities at Children's Manor the way she had when her older son James was enrolled there. But the argument was that her use of the facilities was limited because she was trying to avoid exposure to latex. Counsel did not contend that Meade's inability to use this particular school's facilities was itself a limitation upon some other major life activity. Meade's counsel also pointed out that Andrew was enrolled at another school. Counsel said nothing, however, about any limitation upon Meade's ability to engage in the major life activities of socialization or parenting.

During his rebuttal argument, Meade's counsel reemphasized that the major life activity relied upon was Meade's

breathing. Counsel stated: "Major life activity. The major life activity is breathing."

We fail to see how the jury could reasonably have concluded that the major life activities that supported Meade's claim of being handicapped were the activities of socialization and parenting. But even if the jury had been sufficiently creative to consider such alternative possibilities, the evidence of any limitation upon Meade's activities was even more sparse with regard to socialization and parenting. As the Supreme Court stated in *Toyota Motor, supra,* 534 U.S. at 198, 122 S.Ct. 681, quoted above, in order for a person to be considered disabled, the limitation upon the pertinent major life activities must be more than a series of inconveniences. Instead, "*an individual must have an impairment that prevents or severely restricts* the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact *must also be permanent or long term.*" (Emphasis added.) Meade presented no evidence that would have permitted the jury to find that her allergy had "prevent[ed] or severely restrict[ed]" her socialization or parenting. Consequently, the trial court erred in basing its denial of the motion for JNOV on the possibility that the jury made a finding that a major life activity other than breathing was impaired.

**THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY IS REVERSED.**

**COSTS TO BE PAID BY APPELLEE.**